IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DONALD J. FERNANDES,

Petitioner,

vs.

M. ELIOT SPEARMAN, Warden, High
Desert State Prison,

Respondent.

No. 2:15-cv-00213-JKS

MEMORANDUM DECISION

Donald J. Fernandes, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Fernandes is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at High Desert State

Prison. Respondent has answered, and Fernandes has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On August 27, 2010, Fernandes was charged with the murder of his girlfriend Karen

Curtin in an information that additionally alleged that he used a deadly and dangerous weapon in

commission of the crime. The same day, Fernandes pleaded not guilty and proceeded to a jury

trial on October 20, 2011. On direct appeal of his conviction, the California Court of Appeal laid

out the following facts underlying the charges against Fernandes and the evidence presented at

trial:

> On January 24, 2010, [Fernandes] struck Curtin in the head with a hammer 10
> separate times. The attack occurred in her bedroom. Curtin was either on her bed when
> [Fernandes] struck her with the hammer or the assault caused her to fall onto the bed.
> Each blow lacerated her skin, causing blood to spatter on a bedroom wall and on clothes
> baskets near her bed. Several blows landed on the right side of Curtin's head, splitting
> open her skull and tearing the brain. She also received multiple facial fractures. One of
> the blows was partially blocked by Curtin's right hand and severed the tip of one of her

fingers. The assault rendered Curtin unconscious, but did not result in her immediate death.

Rather than call for emergency medical services, [Fernandes] called an ex-girlfriend, Marti Hall. [Fernandes] told Hall he had spent the previous night at Curtin's house. According to [Fernandes] , when he and Curtin got up that morning, they started fighting. At some point, Curtin "came at [him] with a hammer." [Fernandes] then "blacked out." When he came to, Curtin was hurt. Hall tried to convince [Fernandes] to call 911. [Fernandes] said he did not want to go to jail. Hall then hung up the phone and called 911.

Officers Tamer Sabra and Steven Davis with the Sacramento Police Department responded to Curtin's house and knocked on the front door. Receiving no response, they went around to the back of the house, found the back door partially open, announced their presence, and entered the house. As they entered, [Fernandes] came out of Curtin's bedroom and closed the door behind him. The officers ordered [Fernandes] to put his hands up and walk towards them. [Fernandes] complied with their commands and started to cry. Officer Davis handcuffed [Fernandes] and sat him down in the kitchen. As Officer Sabra walked over to Curtin's bedroom, [Fernandes] volunteered: "She tried to hit me with a hammer. I took it from her and hit her with it." Officer Sabra opened the bedroom door and found Curtin lying on the bed with a black trash bag over her head. She was still alive, but her breathing was labored. When Officer Sabra removed the bag, he "saw on the right side of her head there was a lot of blood, [and there] appeared to be brain matter on the wound." The officer also found a sock in Curtin's mouth. At this point, Officer Sabra removed the sock and yelled: "This is bad, this is bad . . . . There's a sock in her mouth." Still in the kitchen with Officer Davis, [Fernandes] responded: "I tried to put her out of her misery."

Paramedics arrived a short time later and transported Curtin to the University of California at Davis Medical Center. She was in a coma when she arrived. As mentioned, Curtin had numerous lacerations, an open skull fracture, multiple facial fractures, and severe hemorrhaging in the brain. There were also "multiple different hemorrhages within the muscles and the soft tissues on the inside of her neck," which was consistent with "[a]ny sort of blunt force injury or compression of the neck." Due to the severity of the brain injury, the neurosurgery team did not believe there to be any viable treatment options. The decision was made to provide Curtin with comfort care and allow her to die. She died on January 28, 2010.

[Fernandes] testified at trial. According to his account of events, he went to Curtin's house the night before the murder to see her and to pick up a pair of designer jeans he had previously left there. However, Curtin believed [Fernandes] owed her $80 and wanted the money before she would return the jeans. [Fernandes] stayed the night. The following morning, Curtin "started having one of her panic attacks and anxiety attacks." According to [Fernandes] , he had seen her have these attacks in the past and understood "she wasn't taking medication that she told [him] she was supposed to be taking." [Fernandes] suggested they "go to the doctor or to the hospital to get her help." At that point, as [Fernandes] explained: "She completely flipped out on me and told me that she would not go to the doctor, and told me that if I called or tried to attempt to take

her, that she would fucking kill me." Curtin then grabbed a hammer and "came towards [him] in a swinging motion." That was when [Fernandes] blacked out. When he regained consciousness, he was lying on the bedroom floor. He stood up, saw Curtin's body "sprawled out on the bed," and "bolted from the room in a panic." [Fernandes] then called Hall. When he got off the phone with her, he believed Hall would be calling 911. [Fernandes] then got dressed. The next thing he remembered was being taken into custody by police. He thought that he may have "passed out" between getting dressed and the arrival of the officers because he was "light-headed and in a drowsy state." [Fernandes] denied saying to Officer Davis that he tried to put Curtin out of her misery. He did not explain how the sock ended up in Curtin's mouth or how the trash bag ended up over her head, except to say he did not "recall doing anything like that."

At the time of the murder, [Fernandes] was 6 feet 2 inches tall and weighed 205 pounds. Curtin was 5 feet 5 inches tall and weighed 120 pounds.

*People v. Fernandes*, No. C070233, 2013 WL 4508718, at *1-3 (Cal. Ct. App. Aug. 22, 2013).

At the conclusion of trial, the jury convicted Fernandes of first degree murder with an enhancement for the personal use of a deadly weapon. The trial court subsequently sentenced Fernandes to an indeterminate term of 25 years to life imprisonment, plus a consecutive determinate term of 1 year for the deadly weapon enhancement.

Through counsel, Fernandes appealed his conviction, arguing that: 1) the prosecution presented insufficient evidence of deliberation and premeditation to sustain his first-degree murder conviction; 2) the trial court violated his due process rights by denying his request to obtain the victim's medical records from the Sacramento County Mental Health Treatment Center; 3) the trial court abused its discretion by excluding from evidence a booking photo of the victim that was offered to counter the purported prejudicial impact of a more "flattering" pre-death photo offered by the prosecution; 4) the trial court made two errors in instructing the jury; and 5) the prosecutor engaged in misconduct during cross-examination of Fernandes and in rebuttal argument. The California Court of Appeal unanimously affirmed the judgment against Fernandes in a reasoned, unpublished opinion issued on August 22, 2013. *Fernandes*, 2013 WL

4508718, at *14. The California Supreme Court summarily denied review on October 30, 2013.

His conviction became final on direct review 90 days later, when his time to file a petition for

certiorari in the U.S. Supreme Court expired on January 28, 2014. *See Jiminez v. Quarterman*,

555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

Fernandes timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on

January 21, 2015. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Fernandes raises the following five grounds for

relief: 1) the record contains legally insufficient evidence of deliberate and premeditated murder

to sustain his first-degree murder conviction; 2) he was denied due process by the exclusion of

evidence pertaining to the mental history of the victim; 3) the trial court erroneously denied the

defense request to admit booking photos of the victim in lieu of, or in addition to, the "attractive"

portrait submitted by the prosecution; 4) the prosecutor committed misconduct during

questioning and rebuttal argument; and 5) the jury was improperly instructed on consciousness

of guilt.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Fernandes has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

### A. *Insufficiency of the Evidence* (Ground 1)

Fernandes first argues that the evidence of premeditation and deliberation was legally insufficient to sustain his first-degree murder conviction. As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not

usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the

jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Under California law, "[m]urder is the unlawful killing of a human being, . . . with malice aforethought." CAL. PENAL CODE § 187(a). First degree murder includes murder perpetrated by "any . . . kind of willful, deliberate, and premeditated killing[.]" CAL. PENAL CODE § 189. "'[D]eliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." *People v. Wright*, 703 P.2d 1106, 1114 (1985) (quoting with approval pattern jury instructions). "The word 'premeditated' means considered beforehand." *Id.* "A cold, calculated judgment and decision may be arrived at in a short period of time," but "[t]o constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill." *Id.*

The type of evidence which courts have found sufficient to sustain a finding of premeditation and deliberation fall into three basic categories: (1) facts about how and what the defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing (i.e., planning activities);

8

(2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a motive to kill the victim; and (3) facts about the manner of the killing from which the jury could infer a preconceived design to take the victim's life. *People v. Anderson*, 447 P.2d 942, 949 (Cal. 1968). These three categories of evidence are not an exhaustive list, but "provide guidelines" for analysis. *People v. Perez*, 831 P.2d 1159, 1163 (Cal. 1992); *see also Davis v. Woodford*, 384 F.3d 628, 640 & n.3 (9th Cir. 2004) (applying *Anderson* guidelines on federal habeas review but noting admonition of California Supreme Court that *Anderson* did not define elements of first degree murder or definitively state prerequisites for proving premeditation and deliberation in every case, but rather was intended only as a framework to aid in appellate review) (citation and quotations omitted).

In support of his claim, Fernandes argues that the manner of killing was ambiguous because the evidence supported the finding of a spontaneous, unplanned act. But this argument simply avers that the jury should have viewed the evidence differently; all of the evidence he identifies in support of his claim was before the jury for its assessment. This Court is precluded from re-weighing the evidence. *Schlup*, 513 U.S at 330. Moreover, as the California courts have frequently held, premeditation does not require an extended period of time. *People v. Thompson*, 231 P.3d 289 (Cal. 2010); *People v. Koontz*, 46 P.3d 335 (Cal. 2002). "The test is not time, but reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." *Thompson*, 231 P.3d at 321 (citation omitted). As the Court of Appeal reasonably concluded:

>    Here, we do not find evidence of planning. . . .[Fernandes] did not bring the murder weapon to the argument that resulted in the victim's death. The record reveals that Curtin kept hammers around the house because she restored old furniture. According to [Fernandes'] testimony, Curtin came at him with the hammer and then he

blacked out. However, the jury was not required to believe this version of events. Indeed, as mentioned, [Fernandes] stated to the responding officers: "She tried to hit me with a hammer. I took it from her and hit her with it." This spontaneous statement belies his claim that he did not remember hitting Curtin with the hammer. And from it, the jury could reasonably infer he deliberately took the hammer from Curtin in order to hit her with it. Moreover, the jury could have disbelieved that Curtin initiated the violence with the hammer. At the time of his arrest, [Fernandes] had no injuries consistent with having been hit with a hammer. [Fernandes] also admitted during his testimony at trial that he went over to Curtin's house the night before the murder to retrieve a pair of designer jeans he had left there, but Curtin wanted the $80 she claimed [Fernandes] owed her. Immediately after hitting Curtin with the hammer, [Fernandes] called Hall and admitted he and Curtin got into an argument that morning. The jury could reasonably have concluded this argument was over Curtin's demand for $80 before she would return the jeans to [Fernandes]. But this does not mean [Fernandes] planned his murderous attack with the hammer ahead of time. The record does not reveal where the hammer was prior to the argument. Thus, [Fernandes] may have simply grabbed the closest object, which happened to be the hammer.

Nevertheless, we do find substantial evidence of premeditation and deliberation. As we have explained: "'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' "'" Thus, [Fernandes] need not have planned the murder in advance in order to have reflected on his decision to kill Curtin. [Fernandes] had a motive to kill Curtin: retrieval of his designer jeans and anger at Curtin's refusal to return them to him. And most importantly, the manner of killing is indicative of a deliberate intent to kill. . . . [H]ere, [Fernandes] viciously and repeatedly hit Curtin in the head with the hammer, refused to call for emergency services, and then took active steps to make certain she died, *i.e.*, by placing a sock in her mouth and trash bag over her head to "put her out of her misery." (*See People v. Davis* (1995) 10 Cal.4th 463, 510 [manner of killing alone may support conviction for first degree premeditated murder]; *People v. Lee* (2011) 51 Cal.4th 620, 637 [manner of killing and defendant's statement that he wanted to "'straighten [the victim] out'" supported conviction for premeditated first degree murder].)

We conclude the record contains sufficient evidence to support the jury's finding that the murder was committed with premeditation and deliberation.

*Fernandes*, 2013 WL 4508718, at *4-5.

Although it might have been possible to draw a different inference from the totality of the evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Thus, considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, this Court concludes that there was sufficient evidence of premeditation and

deliberation introduced at trial from which a rational trier of fact could have found beyond a reasonable doubt that Fernandes was guilty of the first-degree murder of Curtin. Curtin is therefore not entitled to relief on his insufficiency of the evidence claim.

## B. *Evidentiary Errors* (Grounds 2, 3)

Fernandes next contends that the trial court made two evidentiary errors. The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights. *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Indeed, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution." *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67). Where a due process violation is alleged stemming from an evidentiary challenge, federal courts review such alleged due process

violations for whether admission of certain evidence "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). The "[a]dmission of evidence violates due process only if there are *no* permissible inferences the jury may draw from it." *Boyde*, 404 F.3d at 1172 (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991)) (internal quotation marks omitted; emphasis in original); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (noting that the Supreme Court has not made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ of habeas corpus).

### 1. *Mental health history*

Fernandes first challenges the trial court's rejection of his request for the subpoenaed confidential mental health records of the victim. The Court of Appeal laid out the following facts underlying this claim:

> On July 14, 2011, [Fernandes'] attorney served the Sacramento County Mental Health Treatment Center with a subpoena seeking to obtain Curtin's medical records. The following week, the Sacramento County Counsel filed a written opposition to the subpoena asserting Curtin's mental health records, if they existed, were protected by the psychotherapist-patient privilege of Evidence Code section 1014, which provides that a patient "has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist." The opposition also claimed any such records were privileged under Welfare and Institutions Code sections 5328 and 10850.1
>
> On September 13, 2011, defense counsel filed a declaration under seal in support of the release of the subpoenaed records. The declaration stated: "It is my understanding, that at the time of the event [Curtin] had a history of mental instability and possible violence, and had received treatment at the Sacramento Mental Health [Treatment] Center. [¶] At the time of [Curtin's] death, [Fernandes] stated to the police that she had attacked him with a hammer, and, that this was the last thing he could remember. [¶] It is my belief that the Sacramento Mental Health [Treatment] Center records may contain

information, or will lead to information, that substantiates [Fernandes'] claim of [Curtin's] propensity for violence, or mental instability."

On October 20, 2011, the prosecution filed a motion in limine requesting that the trial court "exclude any testimony or documentation concerning [Curtin's] mental health" as "irrelevant to the issues in this case." The same day, the trial court allowed defense counsel to make an offer of proof in support of his request to obtain the subpoenaed records. Counsel explained: "I can say that my client informed me on the day of the incident that he'd had a conversation with [Curtin]. [¶] Essentially he had some concerns about her behavior, and it was his belief, having a relationship in excess of four years I believe, a dating relationship on again and off again, that when she was off her meds she became violent. [¶] And, in fact, he suggested that they need[ed] to go to the hospital because he believed that she was either high or on—or mentally unstable because she was not on her meds, psychiatric meds, and that's when she grabbed a hammer and came after him. [¶] So I think it's important, first of all, to substantiate, if he were to take the stand, to substantiate the fact that she was on these meds. [¶] And perhaps those records may demonstrate there was times [sic ] when she was taking her meds that she was supposed to—there's probably times when she was and, and [sic ] then what her conduct was, if noted in those records, whether they were violent or unstable in some fashion. [¶] Also, if there's any specific instances [sic ] of violence when she—or certainly violence when it comes to her behavior and my client's ability to protect himself, self-defense situation, but also even instability in that he, I believe would testify that he would treat her with kid gloves and became very nervous and concerned when she was off her medication because she would become completely unstable, unpredictable and violent."

The trial court then reviewed the subpoenaed records in camera and denied [Fernandes'] request, explaining: "[T]he Court has determined that there are no records in this sealed envelope that would be relevant, material and/or tend to support any admissible evidence based on the offer of proof that was made in chambers. [¶] Without breaching the confidences of the victim's mental records, I'll only say that they describe, these records, events that occurred in 2005 and 2000—and 2007." These records were provided to [the Court of Appeal] under seal.

*Fernandes*, 2013 WL 4508718, at *5-6.

It is well-settled that a criminal defendant has a constitutional right to present a defense.

*Crane v. Kentucky*, 476 U.S. 683, 690 (1986). This right is not, however, without limitation.

"The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400,

410 (1988). "[S]tate and federal rulemakers have broad latitude under the Constitution to

establish rules excluding evidence from criminal trials." *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see Crane,* 476 U.S. at 689-690; *Marshall v. Lonberger,* 459 U.S. 422, 438, n.6, (1983); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554, 564 (1967). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune,* 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion). Moreover, good cause to compel production of confidential records in a criminal action does not entitle a defendant to receive them. Rather, the custodian of the records forwards them to the court and, if good cause exists, the court reviews them *in camera*, balancing the defendant's right of confrontation against the subject of the record's right of privacy, and determine which records, if any, are essential to the defendant's right of confrontation. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 59-61 (1987) (defendant's right to fair trial when seeking disclosure of confidential records is adequately protected by an *in camera* review of the records). If the court determines after an in camera hearing that no records may be disclosed, a defendant is not entitled to view the documents in order to show the court abused its discretion. *Id.*

    In this case, Fernandes acknowledged on direct appeal that, unlike in typical cases challenging a trial court's refusal to disclose a complainant's confidential records, his claim does not implicate his right to confront Curtin as a witness because she was deceased at the time of

the trial.  Rather, he contends that the lack of disclosure deprived him of his due process right to present a defense because the records containing Curtin's history of mental treatment and mental issues would have corroborated his testimony that Curtin had an anxiety attack the day she was killed and attacked Fernandes with the hammer.  The Court of Appeal rejected Fernandes' contention, "finding  no reasonable probability that, had the trial court disclosed the records to the defense, the result of the trial would have been different.  Nor do we find a reasonable probability that nondisclosure caused an adverse effect on defense counsel's investigations or trial strategy."  *Fernandes*, 2013 WL 4508718, at *6.

Fernandes fares no better on federal habeas review.  Again, Fernandes' challenge to the trial court's evidentiary ruling raises no federal question because "alleged errors in the application of state law are not cognizable in federal habeas corpus."  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see also Cooper v. Brown*, 510 F.3d 870, 1001 (9th Cir. 2007) (claim of evidentiary error "fails to present a federal question cognizable on federal habeas review").

Moreover, there is no clearly established federal right to compel pretrial discovery in a situation like Fernandes', particularly since the discovery he requested would not have directly provided him with a defense under California law and the trial judge conducted an *in camera* review of the records, which was affirmed by the Court of Appeals.  *See Ritchie*, 480 U.S. at 53,

64-65;[1] *see also Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992) ("A defendant has no right

. . . to present irrelevant evidence."). Fernandes is thus not entitled to relief on this ground.

## 2. *Booking photo*

Fernandes additionally avers that the trial court erred in excluding from evidence a

booking photo of Curtin that was offered to counter the purported prejudicial impact of a photo

offered by the prosecution and admitted into evidence. The Court of Appeal considered and

rejected this claim as follows:

> [Fernandes] acknowledges that a pre-death photograph of Curtin was "relevant to
> show the extent of the harm caused by [Fernandes'] actions." (*People v. Cole*, *supra*, 33
> Cal.4th at p. 1198.) Thus, he does not quarrel with the trial court's decision to allow into
> evidence a photograph of Curtin taken during a family birthday party in 2005.
> Nevertheless, he asserts the trial court should have also allowed the admission of a
> sanitized booking photograph taken in 2003 following a domestic violence incident
> between Curtin and a previous boyfriend, Charles Hughes. Hughes testified about this
> incident during [Fernandes'] case. [Fernandes] argues that "the sanitized booking
> photograph should have been introduced in addition to the flattering 'head shot' of the
> victim. The goal should be to erase any prejudicial effect of [the] more flattering image,

---

[1]     In *Ritchie*, the Court considered and rejected the Supreme Court of
Pennsylvania's decision that, in a case like this, a defendant was entitled to have his attorney
review all of a complaining witness's confidential records, with an advocate's eye, to see if there
might be information relevant to exculpation or the impeachment of adverse witnesses. 480 U.S.
at 51-56. The *Ritchie* court held that the defendant was entitled to have the trial court review the
records in camera to determine whether relevant information was available, but was not entitled
to conduct a fishing expedition through the complaining witness' records himself. *Id.* at 57-58.
The superior court followed this procedure. No Supreme Court decision reaches the next step
and determines whether, after an in camera review, the trial court committed federal error in
limiting the information disclosed. On this point, we must look to more general discussions in
Supreme Court opinions addressing unrelated facts. Of course, the more general the rules we are
applying, the more leeway the state court has in reaching a "reasonable" application. *Renico v.
Lett*, 559 U.S. 766, 776 (2010). In an abundance of caution, the Court obtained the confidential
mental health records at issue. Docket Nos. 17, 18. This Court's independent *in camera* review
confirms that no material exculpatory evidence was withheld, and the state court's rejection of
this claim was reasonable. There was nothing in the records showing that the victim became
violent when she had an anxiety attack or failed to take her medicine. The records therefore do
not corroborate the defense theory.

if that is possible. To fail to introduce both photographs is to elevate this victim's status and create a special sympathy factor which would otherwise be considered irrelevant." We disagree for two reasons.

First, while we agree with [Fernandes'] observation that there is no "single or preferred means of presenting [photographic evidence of a murder victim during life]; an unflattering photograph is just as probative as a flattering photograph," the reverse is also true. And here, aside from whether the photographs are "flattering" or not, the trial court could reasonably have concluded the most recent photograph was the most probative for purposes of showing the extent of the harm caused by defendant's violent assault. (*See People v. Cole*, *supra*, 33 Cal.4th at p. 1198.) We cannot find this to be "an arbitrary, capricious, or patently absurd" decision. (*People v. Rodriguez*, *supra*, 20 Cal.4th at pp. 9–10.)

Second, we perceive no prejudice arising from the admission of the 2005 photograph of Curtin. It is a family photograph. As with many such photographs, Curtin is smiling. But this does not "present a one-sided image" of Curtin. We must assume jurors are intelligent persons capable of understanding that a family photograph does not capture the whole of a person. (*See People v. Valdez* (2011) 201 Cal.App.4th 1429, 1437 [jury system rests on the assumption jurors are intelligent and capable persons].) Nor can we conclude the jury's passions and prejudices would have been inflamed by admission of the family photograph. (*See People v. Gurule* (2002) 28 Cal.4th 557, 655.) Because there was no prejudicial effect to be erased by the less flattering booking photo, the trial court's decision to exclude the latter photograph could not have resulted in a "manifest miscarriage of justice." (*People v. Rodriguez*, *supra*, 20 Cal.4th at pp. 9–10.)

We conclude the trial court did not abuse its discretion by excluding from evidence the booking photo of Curtin.

*Fernandes*, 2013 WL 4508718, at *7.

Again, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution." *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967). Although he states in conclusory fashion that the exclusion of the victim's booking photo violated his constitutional rights, Fernandes fails to demonstrate any such violation, and, as previously noted, he cannot transform his state-law evidentiary claim into a federal one merely by asserting a violation of

due process.  *See Langford*, 110 F.3d at 1389.  Fernandes is therefore not entitled to relief on this

claim.

## C.    *Prosecutorial Misconduct* **(Ground 4)**

Fernandes next alleges that the prosecutor committed misconduct during his cross-

examination of Fernandes and during rebuttal argument.  The Court of Appeal considered and

rejected the prosecutorial misconduct claim on direct appeal as follows:

### The Prosecutor's Cross–Examination of [Fernandes]

During cross-examination of [Fernandes], the prosecutor asked: "Now you said
on direct examination that you have never raised a hand to a woman.  [¶]  Isn't it true that
you struck [Curtin] about two weeks prior to this incident in front of her neighbor, Jamie
Merritt (phonetic)?"  [Fernandes] answered: "No."  [Fernandes'] counsel did not object
to this question, request that the answer be stricken, or request a curative admonition.  On
appeal, [Fernandes] argues this question referred to "facts not in evidence" and was "an
improper means of proof and a violation of the right of confrontation."  He further asserts
the failure to object should be excused because "an admonition would not have cured the
harm" caused by this question, especially in light of the "consistent pattern of
polemic-through-cross-examination" engaged in by the prosecutor.  The argument is
forfeited.  As we explain more fully below, we disagree with [Fernandes']
characterization of the prosecutor's cross-examination as a whole.  Even assuming this
particular question should not have been asked (*see People v. Wagner* (1975) 13 Cal.3d
612, 618–619), we cannot conclude that an objection would have been futile or an
admonition ineffective.  Nor would we find a reasonable probability of a more favorable
result without the asserted misconduct.  (*See People v. Davis*, *supra*, 46 Cal.4th at p.
612.)

[Fernandes] also complains the prosecutor asked whether his statement to Officer
Davis ("I tried to put her out of her misery") was "the most potent evidence" against him.
Defense counsel's "argumentative" objection was sustained.  The prosecutor then asked:
"You're denying that because that is a pretty significant piece of evidence for the
prosecution, correct?"  The trial court sustained defense counsel's objection that the
question called for speculation.  The prosecutor moved on.  Even if the questions were
improper, this does not rise to the level of reversible prosecutorial misconduct.  The
objections were sustained, [Fernandes] did not answer the questions, and the prosecutor
moved on to another subject.  "A party is generally not prejudiced by a question to which
an objection has been sustained."  (*People v. Johnson* (2003) 109 Cal.App.4th 1230,
1236; *People v. Dykes* (2009) 46 Cal.4th 731, 764 ["because the trial court sustained
objections to the argumentative element of the prosecutor's questioning, we assume any
prejudice was abated"].)  Nor can [Fernandes] be heard to complain that the trial court

did not admonish the jury to disregard the questions. Defense counsel did not request such an admonition.

[Fernandes] further asserts the following questions amounted to reversible misconduct because they improperly asked about his willingness to take a plea in violation of Evidence Code section 1153. The prosecutor asked [Fernandes] about a pretrial phone conversation with his friend, Brandy Smith, during which [Fernandes] said: "'I have talked to people in here who have done worse and they have gotten five to six years. I am not even tripping. If they drop it down to involuntary manslaughter, I am cool. I will take whatever they throw at me.'" When asked whether he recalled that conversation, [Fernandes] answered: "I may have said that." Defense counsel did not object. A short time later, the prosecutor asked [Fernandes] about certain pretrial phone conversations he had with his mother. The prosecutor asked: "Do you recall telling your mother that you're gonna fight for less than life?" [Fernandes] answered: "Why wouldn't I?" The prosecutor clarified: "When you say you're going to fight for less than life, you mean you're going to do whatever you can to get out from under a conviction of murder, correct?" Defense counsel objected that the question was "argumentative and vague." The trial court sustained the objection and excused the jury for the noon recess. During the noon recess, the trial court expressed concern that "there was at least one question, and then a second question that was objected to that referenced jail conversations with [Fernandes'] mother and/or a former girlfriend, wherein the [Fernandes'] responses made reference to potential life imprisonment. [¶] The Court is concerned that the jury not be exposed to the question or subject of penalty or punishment, and proposes to give a limiting, a brief limiting instruction to the jury when they enter the courtroom reminding them that that subject is not for their consideration, and that their determination in this case will be without concern for penalty or punishment." Following the noon recess, the trial court gave the proposed admonition.

Acknowledging there was no objection to the question about his conversation with Smith, [Fernandes] argues the trial court's interruption of the proceedings preserves the issue for review. (*See People v. Collins* (2010) 49 Cal.4th 175, 226–227.) We agree the trial court in effect interposed its own objection to the prosecutor's reference to potential punishment. But this is not the same as [Fernandes'] argument on appeal that the questions improperly asked about [Fernandes'] willingness to take a plea. This argument is forfeited. It also lacks merit. Evidence Code section 1153 provides: "Evidence of a plea of guilty, later withdrawn, or of an offer to plead guilty to the crime charged or to any other crime, made by the defendant in a criminal action is inadmissible in any action or in any proceeding of any nature, including proceedings before agencies, commissions, boards, and tribunals." This provision applies "only to statements made in the context of bona fide plea negotiations," *i.e.*, "statements made to the trial court and to the prosecuting attorney because those are the participants in a plea bargain." (*People v. Magana* (1993) 17 Cal.App.4th 1371, 1377.) The provision does not apply to "voluntary disclosures about the bargaining process made to third persons uninvolved and unnecessary to the plea negotiations." (*Ibid.*) Thus, [Fernandes'] statements to Smith and his mother are not covered by Evidence Code section 1153. The prosecutor's questions did not amount to misconduct.

Defendant also complains about the manner in which the prosecutor asked whether he had ever joked about being accused of committing murder. Outside the presence of the jury, defense counsel informed the trial court he anticipated the prosecutor would ask [Fernandes] about a pretrial phone conversation with Smith, during which he said: "'The reason I am calling you so early is that's when they let the killers out.'" Counsel objected on relevance grounds. The prosecutor responded: "He's laughing when he says it. [¶] That's the point. He is laughing and joking with this particular caller about the fact that, you know, 'That's when they let the killers out,' (ha-ha-ha), not showing any remorse at all, which is a total juxtaposition to how he acted on direct examination." The trial court expressed concern that "the jury might conclude [from the phrase '[t]hat's when they let the killers out'] that the jailer, the Sheriff, houses the most dangerous, violent inmates that are held during pretrial custody in a particular section. And that therefore the jury might conclude that [Fernandes] is such a person because the Sheriff thinks so." The prosecutor suggested she could "phrase [her] question in terms of: 'Haven't you joked about being accused of murder?'" The trial court agreed this would resolve the concern and "embrace[d] the People's reasons for wanting to ask the question."

The prosecutor then asked [Fernandes]: "Haven't there been times where you have joked about being accused of murder?" Defendant answered: "I don't recall ever joking about being accused for murder." The prosecutor followed up: "Do you recall a telephone call with Brandy Smith from the jail on February 5th, 2010? [¶] It was fairly early in the morning, and you call [Smith] and she says: 'Why did you get—how come you got to call me so early?' [¶] And you joked with her about: 'Oh, this is when they let us killers out' or something to that effect?" Defense counsel's objection was sustained and the jury was admonished to disregard the prosecutor's question. The prosecutor then asked: "Did you joke with [Smith] about being let out to use the phone because you were a killer?" After another objection was sustained, the prosecutor moved on to another subject. While we agree the prosecutor's question included the statement the trial court found to be objectionable, we find no prejudice since defense counsel's objection was sustained and the jury was directed to disregard the question. (*See People v. Dykes*, *supra*, 46 Cal.4th at p. 764; *People v. Johnson*, *supra*, 109 Cal.App.4th at p. 1236.)

[Fernandes'] final assertion of prosecutorial misconduct arising from the prosecutor's cross-examination of him concerns "were they lying" questions. As mentioned, Officer Davis testified [Fernandes] told him: "I tried to put [Curtin] out of her misery." [Fernandes] denied making this statement. During cross-examination, the prosecutor asked defendant whether Officer Davis was committing perjury. Defense counsel's objection, that the issue of credibility was "for the jury," was sustained. The prosecutor then asked: "Are you saying he was lying about that?" The same objection was sustained. The prosecutor finally asked: "When Officer Davis, a sworn Officer took the stand, and testified that you said: 'I tried to put her out of her misery,' was that not true?" Defense counsel again objected on the ground that whether Officer Davis was telling the truth was "for the jury" to decide. The prosecutor asked to approach, an unreported sidebar was held, after which the prosecutor moved to another subject.

[Fernandes] argues these "were they lying" questions were argumentative. However, because defense counsel did not object on this ground below, the claim is forfeited. (*See People v. Gonzales and Solis* (2011) 52 Cal.4th 254, 318.) Arguing that a question is for the jury to decide is different than arguing that the question is argumentative. The potential problem with "were they lying" questions is not that they invade the province of the jury. As our Supreme Court has explained: "It is a truism that it is for the jury to determine credibility. Questions that legitimately assist the jurors in discharging that obligation are proper. The 'legal cliché used by many courts, [that evidence would "invade the province" or "usurp the function" of the jury' is, as Dean Wigmore has said, '"so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric," and "remains simply one of those impracticable and misconceived utterances which lack any justification in principle."' [Citations.]" (*People v. Chatman* (2006) 38 Cal.4th 344, 380.) The potential problem with "were they lying" questions is that they may be "argumentative," or call for "irrelevant or speculative testimony." (*Id.* at p. 381.) "If a defendant has no relevant personal knowledge of the events, or of a reason that a witness may be lying or mistaken, he [or she] might have no relevant testimony to provide. No witness may give testimony based on conjecture or speculation. [Citation.] Such evidence is irrelevant because it has no tendency in reason to resolve questions in dispute. [Citation.]" (*Id.* at p. 382.) Thus, defense counsel's objection that the questions invaded the province of the jury cannot be held to preserve the argument defendant now asserts on appeal.

[Fernandes] claim also fails on the merits. "A defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he [or she] might also be able to provide insight on whether witnesses whose testimony differs from his [or her] own are intentionally lying or are merely mistaken." (*People v. Chatman*, supra, 38 Cal.4th at p. 382.) Here, [Fernandes] was obviously a percipient witness to his statement to Officer Davis. Indeed, during his direct examination, [Fernandes] testified that he actually told the officer: "I didn't want to see her in pain, and I wanted to take her to the hospital, and she freaked out and picked up a hammer and started to attack me." Accordingly, [Fernandes] was able to provide insight into whether Officer Davis was intentionally lying or merely misunderstood his statement. In any event, even assuming the questions were improper, we would find no prejudice since defense counsel's objections to these questions were sustained and defendant did not answer the questions. (*See People v. Dykes*, supra, 46 Cal.4th at p. 764; *People v. Johnson*, supra, 109 Cal.App.4th at p. 1236.) And again, [Fernandes] cannot be heard to complain the trial court did not admonish the jury to disregard the questions because he did not request such an admonition.

**The Prosecutor's Rebuttal Argument**

During rebuttal argument to the jury, the prosecutor argued: "The defense also brought up the fact they presented character witnesses to discuss the defendant's lack of propensity for violence against women. [¶] Well, ladies and gentlemen, just because in the past he may not have struck a woman, had any physical violence towards Marti Hall that she's aware, or other women that she's aware of, doesn't mean he's not capable of doing this horrific crime. [¶] Oftentimes murders [sic ], and I am sure you experienced this with reading the paper and what not, they will hit it out of the ballpark." Defense counsel objected. The trial court sustained the objection and admonished the prosecutor to "limit [her] comments to the evidence before the Court." The prosecutor continued: "Just because there is no evidence that he has committed violence in the past doesn't mean he's not capable of hitting it out of the ballpark, if you will, in this case."

[Fernandes] argues that "[n]either party introduced evidence bearing on the propensity of people in general to commit unforeseen violent assaults." While true, "'[i]t is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 567–568; *People v. Williams* (1997) 16 Cal.4th 153, 221.) The evidence the prosecutor was commenting on was testimony that [Fernandes] was not violent towards women. We conclude it was fair for the prosecutor to comment this evidence does not establish [Fernandes] was incapable of Curtin's murder. The fact that individuals with no history of violent conduct have successfully committed murder is a matter of common knowledge.

Following the "hit it out of the ballpark" comment, the prosecutor argued: "Lastly, the defense points out, and it is true, that the People must prove there was no blackout in this case. [¶] First of all, the Defendant said he didn't know why he blacked out. But that being, that aside, people black out for a reason. [¶] And the defense brought up: Well, look, [the forensic pathologist] said that loss of consciousness is consistent with a concussion. [¶] We have no evidence, there is no evidence because I asked [the responding officers] if the Defendant appeared injured or sick. [¶] No. And we all, when people get concussions, there is physical evidence that they are ill. I mean, I remember watching a football game years ago, the 49'ers, and Steve Young suffered a concussion. Out cold. I remember when he came to—" Defense counsel interposed an objection: "No set of facts." After a brief discussion at sidebar, the trial court overruled the objection. The prosecutor continued: "So there was a game years ago, and Steve Young was tackled, and he had a concussion, and he was completely out of it. He wasn't moving. He was laying [sic ] there. He wasn't able to stand up, do anything. [¶] When somebody blacks out, they're incapable of physical, as a concussion like [defense counsel] mentioned, they're incapable of any physical act or any intentional acts. [¶] That's not the case here. We didn't have a blackout. [¶] We have a man who grabbed a hammer and hit the victim numerous times causing her death. [¶] We know that he did not blackout, and here's the proof beyond a reasonable doubt, because he told [Officer

Sabra]: She came at me with a hammer, tried to hit me with a hammer.  I took it and hit her back."

[Fernandes] asserts the prosecutor's argument—it was "impossible" for him to have blacked out "based on sports injuries she had observed on television"—is "speculation in the guise of argument."  We first note [Fernandes] misconstrues the prosecutor's argument.  She did not argue it was impossible for [Fernandes] to have blacked out.  The prosecutor was responding to the closing argument of defense counsel, during which he argued [Fernandes] claimed blackout was consistent with having suffered a concussion: "[Defendant] has been consistent from word go that it was a blackout.  And the symptoms are of a concussion . . . .  [¶]  It's somewhat, the symptoms—do you remember I asked [the forensic pathologist]: What are some symptoms of a concussion?  [¶]  Dizziness.  All right.  Unable to think clearly.  [¶]  Now this is somewhat telling, all right."  As mentioned, [Fernandes] testified he was "light-headed and in a drowsy state."  The pathologist testified, in connection with whether it was possible [Fernandes] sustained a concussion during the attack, that symptoms of a concussion are being "dazed, confused, a lower than normal level of consciousness."  In response to defense counsel's argument, the prosecutor pointed out there was no evidence [Fernandes] appeared injured or sick.  The prosecutor then described how Steve Young appeared when he suffered a concussion during a football game and argued that a person who blacks out from a concussion is "incapable of any physical act or any intentional acts."  Thus, the prosecutor was not arguing it was impossible for [Fernandes] to have blacked out.  It is common knowledge that people can black out for a number of reasons.  The prosecutor was arguing if [Fernandes] blacked out from having suffered a concussion, as defense counsel suggested, he would have been "[o]ut cold."

However, even with this clarification, we must conclude the argument was not a fair comment on the evidence.  The pathologist did not testify that people who black out from concussions are always completely incapacitated.  And while, as mentioned, an attorney's closing argument may contain matters not in evidence, but that are examples drawn from common experience, history or literature (*People v. Wharton*, *supra*, 53 Cal.3d at pp. 567–568), the prosecutor did not stop at describing the Steve Young situation as one example of a blackout caused by concussive brain injury.  She went one step further and argued that because Steve Young was "[o]ut cold," whenever "somebody blacks out [from having sustained a concussion], they're incapable of any physical act or any intentional acts."  Nevertheless, we find no prejudice.  As was the case in *People v. Ratliff* (1987) 189 Cal.App.3d 696, "the evidence of [Fernandes'] guilt was overwhelming.  [¶] . . . [¶]  Moreover, the jury was instructed that statements of counsel are not evidence.  They were also instructed on burden, degree of proof and the presumption of innocence.  We must presume the jury follows its instructions.  [Citation.]" (*Id.* at pp. 702–703.)

We conclude the prosecutor's behavior did not comprise "'a pattern of conduct "so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process."' [Citations.]" (*People v. Gamache*, *supra*, 48 Cal.4th at pp. 370–371.)  Nor did any particular instance of purported misconduct involve " 'the use of

deceptive or reprehensible methods to persuade the trial court or the jury.' [Citations.]"
(*Ibid.*)

*Fernandes*, 2013 WL 4508718, at \*10-14.

Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct violated due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To prevail on such a claim, a petitioner must show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Moreover, "[o]n habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637-38 (1993)).

Under clearly established federal law, a prosecutor's incorrect and improper comments will be held to violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam) (quoting *Darden v. Wainright*, 477 U.S. 168, 181 (1986)); *see Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000). In determining whether the prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the context of the entire proceeding. *Boyde*, 494 U.S. at 385; *Darden*, 477 U.S. at 179-182. Even when prosecutorial misconduct rises to the level of a due process violation, such misconduct provides grounds for habeas relief only if that misconduct is prejudicial under the harmless error test articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993). *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).

Upon independent review of the challenged comments in light of these guidelines, the Court concludes that the Court of Appeal's rejection of Fernandes' claims was neither contrary to, or an unreasonable application of, clearly-established federal law. For the reasons thoroughly discussed by the Court of Appeal, Fernandes is not entitled to relief on any argument advanced in support of his prosecutorial misconduct claim.

**D.    *Instructional Error* (Ground 5)**

Finally, Fernandes claims that the trial court committed two errors in instructing the jury. Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*.

Fernandes contends that the trial court erred by instructing the jury with CALCRIM No. 361[2] and 362.[3] Fernandes argues, as he did on direct appeal, that it was error to instruct the jury

---

[2]     The instruction as given stated, "If the Defendant failed in his testimony to explain or deny certain evidence against him, and if he could reasonably be expected to have done so based upon what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the Defendant guilty beyond a reasonable doubt. [¶] If the Defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure." At trial, Fernandes testified that, although he remembered certain things such as Curtin's purported anxiety attack and her attempt to hit him with a hammer, he could not explain other things, such as how Curtin had a sock in her mouth and trash bag on her head." CALCRIM No. 361.

[3]     "If the Defendant made a false or misleading statement before the trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude the Defendant made the statement, it is up to you to decide the meaning and importance, it's [sic ] meaning and importance. [¶] However, evidence that the Defendant made such a statement cannot prove guilt by itself." CALCRIM No. 362.

26

with CALCRIM Nos. 361 and 362 by basing his argument on state case law. But again, federal habeas relief is not available for violations of state law, and in any event, this Court is bound by the Court of Appeal's determination that the instructions in this case did not violate California state law. Fernandes fails to show that the instructions were given in error, much less error of constitutional magnitude. Fernandes is thus not entitled to relief on his instructional error claim.

## V. CONCLUSION AND ORDER

Fernandes is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is directed to enter judgment accordingly.

Dated: March 22, 2019.

      /s/James K. Singleton, Jr.
      JAMES K. SINGLETON, JR.
      Senior United States District Judge